15683-222048 MDC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**

PATRICK D. PERRY, et al.

      Plaintiffs,

v.

HARDEMAN COUNTY,
TENNESSEE, et al.,

      Defendants.

Docket No.: 1:19-CV-01106

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' JOINT MOTION TO DECERTIFY COLLECTIVE ACTION**

## I.    PROCEDURAL HISTORY

Plaintiffs have filed several lawsuits seeking compensation for alleged overtime violations of the Fair Labor Standards Act. The Court previously granted conditional certification with a class of:

> Past or present employees of Hardeman County Government working in the Hardeman County Sheriff's Office as sheriff deputies, correctional officers and/or dispatchers… [sic] Each under the direction of the Hardeman County Sheriff and each denied overtime by Hardeman County Government as Sheriff Department employees.

(ECF No. 106 at Page ID 2043-2044; ECF No. 110 at Page ID 2054.) Plaintiffs then listed eight subclasses. (ECF No. 110 at Page ID 2054-2055.)

The parties then consolidated all of the cases. (ECF No. 213 and 214.) After consolidation of the cases, Plaintiffs filed a consolidated complaint in which they outlined the varying FLSA violations that form the basis for their collective action. (ECF No. 228 at Page ID 2605-2661.)

## II.   LAW AND ARGUMENT

### A.  Legal Standard

"Employees seeking to proceed in a collective action to recover unpaid wages under the FLSA must demonstrate that they are 'similarly situated' to one another." *Lockhart v. D&S Residential Servs., LP*, 2020 U.S. Dist. LEXIS 145321, at *10 (W.D. Tenn. Aug. 13, 2020). In the Sixth Circuit, courts have historically used a two-stage inquiry to consider whether members of the collective action are similarly situated.[1] *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006). Here, the Court previously conditionally certified a class at the first stage. (ECF No. 106.) Consequently, the Court faces the second stage.

At the second stage, the Court "more closely scrutinize[s]" class certification because it occurs "after extensive discovery." *Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *11. The named plaintiffs have the burden of demonstrating "that the opt-in plaintiffs are similarly situated." *Frye v. Baptist Mem. Hosp., Inc.*, 2010 U.S. Dist. LEXIS 101996, at *7 (W.D. Tenn. Sept. 27, 2010); *see also Frye*, 495 Fed. App'x at 672; *White v. Baptist Mem. Health Care Corp.*, 2011 U.S. Dist. LEXIS 52928, at *11 (W.D. Tenn. May 17, 2011). To meet this stage's "stricter standard," the named plaintiff "must produce 'more than just allegations and affidavits' demonstrating similarity in order to achieve final

---

[1] The Sixth Circuit recently clarified the requirement for the first stage of the inquiry. *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003 (6th Cir. 2023). And district courts have already observed that "[s]tep two of the collective action determination is relatively unchanged by *Clark*." *Hutt v. Greenix Pest Control, LLC*, 2023 U.S. Dist. LEXIS 120290, at *6 (S.D. Ohio July 12, 2023); *see also Foley v. Wildcat Invs., LLC*, 2023 U.S. Dist. LEXIS 120278, at *5-6 (S.D. Ohio July 12, 2023). Indeed, in *McElwee v. Bryan Cowdery, Inc.*, the district court applied the same standard at the second stage. *McElwee v. Bryan Cowdery, Inc.*, 2023 U.S. Dist. LEXIS 118488, at *30-31 (S.D. Ohio July 10, 2023).

certification." *Frye v. Baptist Mem. Hosp., Inc.*, 495 Fed. App'x 669, 671 (6th Cir. 2012). "To avoid decertification, the named plaintiffs must introduce 'substantial evidence' that the opt-in plaintiffs are similarly situated." *Frye*, 2010 U.S. Dist. LEXIS 101996, at *8. And "the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Frye*, 495 Fed. App'x at 672. Courts consider three factors at this stage: "(1) the 'factual and employment settings of the individual[ ] plaintiffs'; (2) 'the different defenses to which the plaintiffs may be subject on an individual basis'; and (3) 'the degree of fairness and procedural impact of certifying the action as a collective action.'" *Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *12 (alterations in original).

Courts have also found employees similarly situated when "they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Watson v. Advanced Distrib. Servs., LLC*, 298 F.R.D. 558, 561 (M.D. Tenn. Apr. 7, 2014). However, decertification is appropriate when the alleged unlawful practices or policy are not asserted by all of the potential plaintiffs. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 587 (6th Cir. 2009).

If the Court concludes that "the claimants are not similarly situated," the Court "decertifies the class, and the opt-in plaintiffs are dismissed without prejudice," while the class representatives, i.e., "the original plaintiffs," "proceed to trial on their individual claims." *Frye*, 2010 U.S. Dist. LEXIS 101996, at *9; *White* 2011, U.S. Dist. LEXIS 52928, at *13.

**B. The Court must decertify the class because the named plaintiffs are not similarly situated to the opt-in plaintiffs, they each work in different jobs with**

3

**different responsibilities, and not all plaintiffs allege the same unlawful practice.**

The named plaintiffs contend that they are similarly situated to the opt-in plaintiffs. But that is not the case. Plaintiffs' consolidated complaint and discovery to date has revealed that the opt-in plaintiffs and named plaintiffs are not similarly situated by job duties, as they work in various job positions with varying responsibilities and duties from one another. Similarly, the opt-in plaintiffs and named plaintiffs are not similarly situated by virtue of a common policy or practice applicable to all plaintiffs, but rather they have suffered an alleged multitude of FLSA violations.

As to the first factor, Plaintiffs have differing factual and employment settings, which indicate that they are not similarly situated. Relevant considerations "of the similarity of the Plaintiffs' employment are factors such as job duties, geographic location, supervision, and salary." *Price v. Acosta, Inc.*, 2008 U.S. Dist. LEXIS 125789, at *70 (W.D. Tenn. Feb. 19, 2008). The proof demonstrates that the named plaintiffs and opt-in plaintiffs are not similarly situated to one another in the employment setting. As a starting point, Plaintiffs' consolidated complaint admits that the opt-in plaintiffs have differing job duties, as there are several different job roles in this case. Specifically, of the person identified in the consolidated complaint, there are thirty-three sheriff deputies,[2] twenty-

---

[2] Consolidated Complaint at ¶¶ 7, 8, 12, 17, 18, 19, 20, 22, 24, 26, 27, 28, 31, 32, 34, 35, 36, 37, 38, 39, 40, 42, 45, 46, 47, 52, 53, 54, 57, 67, 68, 72, and 74. (ECF No. 228 at Page ID 2607-2616.)

three correctional officers,[3] twelve dispatchers,[4] and one maintenance worker.[5] The job duties of a sheriff deputy, correctional officer, dispatcher, and maintenance worker are distinct from one another. A sheriff deputy, for example, may patrol the streets and investigate crimes, whereas a correction officer works in the Hardeman County Jail supervising and caring for the inmates; both of which are fundamentally distinct from a dispatcher who works at a desk receiving reports, via phone calls, of emergent problems or situations and then sending appropriate personnel to respond to the report. And none of these job positions are similar to the lone maintenance worker who cleans and maintains the facilities of the Sheriff Department.

Even within the same job category of deputy, as confirmed by the consolidated complaint, there is differences in job duties and responsibilities. For example, some sheriff deputies worked regular patrol, others were investigators, some worked an undercover drug operations, some performed work on FBI matters, and some worked supervisory positions. *See* Consolidated Complaint at ¶¶ 118-119 (patrol writing incident/accident reports from shift), 123-126 (investigators investigating crimes), 132-135 (working undercover drug operations), and 243-245 (FBI work) (ECF No. 228 at Page ID 2622-2624 and 2641); David Nabors Dep., at pp. 19-23[6] (worked as a K-9 officer); Brian Vandiver Dep., at pp. 12-13[7] (patrol captain in 2015 until promoted to administrative

---

[3] Consolidated Complaint at ¶¶ 9, 10, 11, 14, 15, 16, 21, 29, 48, 49, 50, 51, 55, 56, 59, 60, 61, 62, 63, 64, 66, 71, and 73. (ECF No. 228 at Page ID 2608-2616.)
[4] Consolidated Complaint at ¶¶ 13, 23, 25, 30, 33, 41, 43, 44, 58, 65, 69, and 75. (ECF No. 228 at Page ID 2608-2616.)
[5] Consolidated Complaint at ¶ 70 (ECF No. 228 at Page ID 2616.) In the consolidated complaint, Plaintiffs offer no specific allegations of an FLSA violation against the maintenance worker—Tim Welch.
[6] Excerpts from David Nabors Dep. are collectively attached as Exhibit 1.
[7] Excerpts from Brian Vandiver Dep. are collectively attached as Exhibit 2.

captain in 2017 where he oversees law enforcement training, is in charge of time records, manages a highway safety grant, and oversees vehicle maintenance);[8] Michael Hatch Dep. at p. 5[9] (he was a lieutenant); Greg Moore Dep., at pp. 19, 39-40, 44, and 110[10] (became chief deputy in 2018 and oversees patrol, investigations, jail, and dispatch; he works predominantly in the office with the primary focus to be management of the entire department), pp. 51-52 (explaining that of the deputies, there is one deputy who works at the jail, deputies that are school resource officers, and deputies who work court security), and pp. 57-68 (before being chief deputy he was a captain, which has different duties than many other deputies, such as patrol deputies and investigators); Patrick Perry Dep. at pp. 193-195[11] (from 2016 through 2019 he worked in multiple roles as a civil process deputy, an investigator, a patrol lieutenant, and then as criminal investigation captain).

Even beyond the differing job roles and responsibilities, the plaintiffs report to different supervisors. As acknowledged by the consolidated complaint, there was a different supervisor for the deputies (Chief Deputy Williams "Billy" Davis) and dispatchers (Captain Wilton Cleveland and Dana Knight). Compare Consolidated Complaint at ¶¶ 115-119 and 123 (deputies) with ¶¶ 171-172 (dispatchers) (ECF No. 228 at Page ID 2622-2623 and 2631). In fact, even within the deputies, there were differing supervisors. *See* David Nabors Dep. at p. 18 (testifying supervisor was Lieutenant Ed Avery); Brian Vandiver at pp. 31-32 (testifying that when he was patrol captain he supervised patrol officers) and p. 73 (testifying when he was patrol captain and administrative captain his

---

[8] Vandiver did not perform patrol from 2017 to December 2020; he only performed patrol in December 2020 for two shifts due to a shortage. Brian Vandiver Dep. at pp. 27-28.
[9] Excerpts from Michael Hatch Dep. are collectively attached as Exhibit 3.
[10] Excerpts from Greg Moore Dep. are collectively attached as Exhibit 4.
[11] Excerpts from Patrick Perry Dep. are collectively attached as Exhibit 5.

15683-222048 MDC

supervisors have been Chief Billy Davis and Chief Greg Moore); Michael Hatch Dep. at p. 20 (testifying that his supervisors were Captain Mike Kennamore and Brian Vandiver); Greg Moore Dep., at pp. 56-57 (testifying that as investigative captain he had 4-6 people report to him).

Further, the deputies, correctional officers, and dispatchers each were paid at a different rate of pay and on different methods. *See* David Nabors Dep., at p. 24 (deputy with rate of pay at $16.34 when quit); Judy Wiggins Dep. at p. 55[12] (dispatcher with rate of pay of $10.24); Jenny Duke Dep. at p. 54[13] (dispatcher with rate of pay of $17.00); Greg Moore Dep. at p. 205 (received a base salary of approximately $52,000 as chief deputy); Patrick Perry Dep. at p. 75-76 (testified told his hourly rate of pay as a captain was to be $18.00 per hour); Carol  Danford McElhone Dep. at pp. 12 and 14[14] (paid a between $9.00-$10.00 when she began as a correctional officer and received an increase when promoted to sergeant); Cheri Baker Dep. at p. 56[15] (dispatcher with rate of pay of $12.26). As to the methods, the dispatchers and correctional officers were paid based on a 48 hour work week the first week and then 32-36 hour work week the second week of the pay period. Consolidated Complaint at ¶¶ 167-170, 173-174, and 185-188 (ECF No. 228 at Page ID 2630-2631 and 2633.) In contrast, deputies worked on a 43 hour workweek as permitted by the FLSA. David Nabors Dep. at pp. 18 (agreeing that regular workweek at Sheriff's Department for patrol officer was 43 hour work week before receiving overtime); Brian Vandiver Dep. at pp. 33-34 and 49 (agreeing that regular

---

[12] Excerpts from Judy Wiggins Dep. are collectively attached as Exhibit 6.
[13] Excerpts from Jenny Duke Dep. are collectively attached as Exhibit 7.
[14] Excerpts from Carol Danford McElhone Dep. are collectively attached as Exhibit 8.
[15] Excerpts from Cheri Baker Dep. are collectively attached as Exhibit 9.

15683-222048 MDC

workweek at Sheriff's Department was 43 hours before receiving overtime); Michael Hatch Dep., at pp. 12-13, 21-22, and 49 (agreeing that deputies worked a 43 hour regular workweek before receiving overtime); Patrick Perry Dep. at p. 98 (agreeing that deputies work a 43 hour regular workweek before receive overtime). Such differing job positions, responsibilities, supervision, and pay rates shows that the named plaintiffs and opt-in plaintiffs are not similarly situated in the employment setting. *See e.g., Price*, 2008 U.S. Dist. LEXIS 125789, at *70-71 (finding differing job duties, geographic locations, different supervisors, and rates of pay not to support similarity in employment setting).

Beyond this lack of similarity in the employment setting, Plaintiffs failed to establish a common policy or practice applicable to all the named plaintiffs and opt-in plaintiffs. Plaintiffs claim that everyone was subject to the same policy and practice—not being paid overtime. *See* Motion to Consolidate (ECF No. 66 at Page ID 1699) (stating that "overtime wages were not paid because Defendants engaged in a practice of not paying employee sheriff deputies, jailers and dispatchers for all hours worked"). Such broad allegations are insufficient at this stage. *See Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *15 ("At this stage, '[A]llegations of an 'overarching' policy are insufficient, and plaintiffs are required to produce 'substantial evidence' of a 'single decision, policy, or plan'' to demonstrate that each was similarly situated to one another.") Further, this is not a policy, but rather it is the common claimed failure to pay overtime damages that each person has allegedly suffered from a multitude of alleged FLSA violations. *See Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *27-28 ("But asserting that D&S's failure to provide overtime compensation qualifies as a common theory of FLSA violations sweeps with too broad a stroke."). Indeed, in the consolidated complaint, Plaintiffs assert that this case "is maintainable as

an 'opt-in' collective action" because the opt-in plaintiffs "are similarly situated to Plaintiffs with regard to their wages and damages, in that they have been denied proper overtime compensation." Consolidated Complaint at ¶ 307 (ECF No. 228 at Page ID 2649). But this is a common result of a host of alleged FLSA violations. A common injury is insufficient to establish a common policy or plan. *See Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *18 ("The portions of the Opt-Ins' depositions cited by Plaintiff's Response only indicate that D&S failed to pay Plaintiff and the Opt-Ins for all hours worked; that they suffered identical injuries, that is, unpaid overtime, does not demonstrate that D&S failed to pay their employees as a result of a common policy discouraging Plaintiff and the Opt-Ins from reporting overtime.").

The focus, however, is on a common policy that led to the damages—not on common damages that all plaintiffs suffered. *See Watson*, 298 F.R.D. at 561 ("[T]he Sixth Circuit has held that 'plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'"). Indeed, in order to certify, courts have required a common policy that affects all plaintiffs rather than the plaintiffs all suffering a common damage. *See e.g., Brewer v. All. Coal, LLC*, 2021 U.S. Dist. LEXIS 134885, at *6-7 (E.D. Ky. July 20, 2021) (finding common policy based on common requirement of all workers in class "to engage in off-the-clock work before and after descending into the mines" and based on uniformly excluding bonuses from overtime calculations); *Fisher v. Mich. Bell Tele. Co.*, 665 F. Supp.2d 819, 822-23 (E.D. Mich. 2009) (finding common policy or plan based on requirement applicable to all class members requiring to work before and after shift and uniform application of rounding policy to disadvantage these employees).

15683-222048 MDC

In the consolidated complaint, Plaintiffs outline differing policies and practices that
are applicable to some but not all of the plaintiffs:

- Policy applicable to deputies required deputies—not correctional officers,
  dispatchers, or the maintenance worker—to work after a shift ended to complete
  incident and accident reports without compensation.[16] Consolidated Complaint at
  ¶¶ 118-120 (ECF No. 228 at Page ID 2622-2623). The policy further required
  deputy supervisors to approve deputy incident and accident reports after a shift
  ended without compensation. *Id*. at ¶¶ 121-122 (Page ID 2623).

- Policy applicable to investigators—a subset of the deputies—worked off the clock
  investigating crimes and did not receive compensation or overtime; Perry, Bryant,
  Hopkins, and Naylor are the only identified persons applicable to this policy.  Not
  all deputies are entitled to this alleged policy/practice. *Id*. at ¶¶ 123-127 (Page ID
  2623-2624).

- Policy applicable to a subset of deputies—Moore, Bryant, and Naylor—required
  that they work off the clock while restarting the Sheriff Department's undercover
  drug operations. *Id*. at ¶¶ 132-136 (Page ID 2624).

- Policy applicable to deputies who worked second and third shift—but not
  applicable to deputies who worked first shift—that second and third shift deputies
  were not paid for in-service training. *Id*. at ¶¶ 137-143 (Page ID 2625-2627).

- Policy of paying dispatchers and correctional officers overtime differently than
  deputies and the maintenance worker. Specifically, dispatchers and correctional
  officers worked a 48-hour shift one week and the second week they worked 32-36
  hours, resulting in alleged FLSA overtime violations during the first pay period. *Id*.
  at ¶¶ 167-170, 173-174, and 185-188 (Page ID 2630-2631 and 2633).

- Dispatchers and correctional officers—but not deputies—were subject to a policy
  that required them to arrive and begin working before their shift began. Specifically,
  dispatchers were required to arrive 15 minutes before their shift began to take over
  the head set, log onto their computer, and receive a briefing from the person being
  relieved. *Id*. at ¶¶ 178-183 (Page ID 2631-2632). Correctional officers, on the other
  hand, were required to arrive at the jail 15-30 minutes before their shift to be briefed
  by the person being relieved and to prepare paperwork for the upcoming shift. *Id*.
  at ¶¶ 193-197 (Page ID 2634).

- Defendants allegedly had a policy of not paying accrued comp time upon
  termination; however, this allegation is limited to certain members—not all

---

[16] This policy while alleged did not apply to all deputies even. Brian Vandiver testified that
he did not perform any pre-shift or post-shift work when he became an administrative
captain in 2017. Brian Vandiver Dep., at pp. 70-71.

15683-222048 MDC

plaintiffs. Specifically, of the 69 persons identified in the consolidated complaint, only 17 plaintiffs are subject to this alleged policy. *Id*. at ¶¶ 211-222 (Page ID 2636-2637).

- Defendants allegedly had a policy of not paying for travel time for National Guard duty, but this policy only affected one person—Vasquez—not all plaintiffs. *Id*. at ¶¶ 297-303 (Page ID 2648).

- Plaintiffs further allege FLSA retaliation claim, but the claims are not on behalf of all plaintiffs. The following specific alleged retaliatory acts occurred against some but not all of the plaintiffs.

  o Plaintiffs allege a number of retaliatory acts towards Perry only of (1) not paying for Perry to attend conferences (*Id*. at ¶¶ 226-232 and 238-241 (Page ID 2638-2641)), denying Perry a raise (*Id*. at ¶ 235 (Page ID 2640)), and not reimbursing Perry for expenses he incurred attending a conference (*Id*. at ¶ 236 (Page ID 2640)).

  o Retaliatory act of denying Perry and Allen only a raise. *Id*. at ¶¶ 233-234 (Page ID 2639-2640).

  o Retaliatory act of refusing to pay Bryant, Naylor, and Moore only for time spent working on FBI matters. *Id*. at ¶¶ 243-245 (Page ID 2641).

  o Retaliatory act of refusing to pay Perry and Naylor overtime. *Id*. at ¶¶ 254-256 (Page ID 2642).

  o Retaliatory act towards dispatchers only of refusing to provide a raise after being told they would receive a raise. *Id*. at ¶¶ 262-263 and 288 (Page ID 2643 and 2646-2647).

  o Retaliatory act towards Ervin, Hampton, Lowrance, Naylor, Pierce, and Vickers only of refusing to pay accrued time when each quit. *Id*. at ¶ 266 (Page ID 2644).

  o Retaliatory act of terminating dispatchers only effective August 27, 2021. *Id*. at ¶¶ 292-293 (Page ID 2647).

Thus, the consolidated complaint demonstrates that the opt-in plaintiffs and named plaintiffs lack a common plan or policy applying to all plaintiffs. While perhaps some similarities exist among some of the groups or individuals, there is much more dissimilarity among the varying FLSA violations alleged by each category of workers—deputies,

15683-222048 MDC

correctional officers, dispatchers, and maintenance worker. For example, for the post-shift alleged work for deputies, Brian Vandiver testified that, after he was promoted to administrative captain in 2017, he performed no post-shift work. Brian Vandiver Dep. at pp. 70-71.[17] Chief Deputy Greg Moore testified that he had no off the clock required pre-shift or post-shift work as an investigative captain or chief deputy, only during his patrol days. Greg Moore Dep. at pp.74 & 161. Dispatch Captain Dana Knight did not require dispatchers to be early. Dana Knight Dep. at p. 116.[18] The same was true for Dispatch Captain Jenny Duke. Jenny Duke Dep. at p. 45. Thus, not all plaintiffs were subject to this alleged policy. For instance, the bases for retaliation are vastly different from each other and also are unique to only certain members but not all of the plaintiffs (e.g., claim of retaliatory discharge is limited only to the dispatcher plaintiffs—not to the maintenance worker, correctional officers, or deputies). Thus, the evidence does not establish a common practice or policy applicable to all plaintiffs, but rather the experiences and treatment of the plaintiffs vary. *See Price*, 2008 U.S. Dist. LEXIS 125789, at *72-73.

Another consideration "is whether there appear to be defenses individual to each Plaintiff." *Price*, 2008 U.S. Dist. LEXIS 125789, at *73. Because of these varying bases for FLSA violations that are applicable to some but not all of the plaintiffs, Defendants' defense will be unique to each basis and will not apply to all named plaintiffs and opt-in

---

[17] In fact, Vandiver testified that all his pre-shift and post-shift work occurred in 2013-2015 before he became patrol captain—outside the statute of limitations. Brian Vandiver Dep., at p. 96. Vandiver also testified that he put a "stop" to patrol deputies having to report 15 minutes early and not being paid for pre-shift activities. *Id.* at 61. Since Lead Plaintiff Captain Patrick Perry testified that from his permanent assignment to investigation in September 2016 until when he became investigative captain, he did not engage in pre-shift activities (Patrick Perry Dep. at 195), his claim for unpaid pre-shift activities fall outside the statute of limitations.

[18] Excerpts from Dana Knight Dep. are collectively attached as Exhibit 10.

15683-222048 MDC

plaintiffs as a whole. *See Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *31 ("The Court also agrees with Defendant that the fact that the Opt-Ins each assert unique theories of FLSA violations that did not result from common D&S policies makes it more likely than not that Defendant will be required to assert individualized, disparate defenses to the Opt-Ins' claims."). For example, in the retaliation section, Defendants will have individualized defenses to the alleged retaliation against Perry that will only apply to Perry. The same will be true for all of the other bases of retaliation. These defenses will be unique to a few plaintiffs—not the entire class. Further, in addition to these differing individual defenses, Defendants will defend the claims based on credibility, which will require Defendants to cross-examine each plaintiff individually to establish contradictory testimony and impeachment of each plaintiff. As such, the defenses will require fact-intensive examination as to each individual plaintiff. Thus, the individualized nature of the defenses supports decertification. *See Price*, 2008 U.S. Dist. LEXIS 125789, at *73-74; *Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *31-33.

With the extremely varied employment settings, individualized claims and defenses, allowing a collective action would present significant fairness and manageability problems. *See e.g., Price*, 2008 U.S. Dist. LEXIS 125789, at *74 ("The lack of factual similarity and the variety of individualized defenses detailed above indicate that proceeding as a collective action in this case would present significant manageability problems."); *White*, 2011 U.S. Dist. LEXIS 52928, at *40 ("Because White has not shown that the Opt-In Plaintiffs are similarly situated, however, there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to Baptist and manageability problems for the Court."). As a practical matter,

a trial of all plaintiffs' claims would result in a multitude of "mini-trials" in which differing groups of plaintiffs will have to prove a violation of the FLSA based on disparate circumstances and subject to particular defenses that would not be common to all plaintiffs. *See Lockhart*, 2020 U.S. Dist. LEXIS 145321, at *35-36 ("Although the potential for 'mini-trials' within an FLSA proceeding does not alone justify decertification, such 'mini-trials' in this case would result in unfairness to Defendant and would be inefficient, especially given that the Opt-Ins are not similarly situated and their claims do not assert a common unlawful policy or practice, or a common theory of FLSA violations."). Thus, the last factor of fairness and manageability support decertification. *Price*, 2008 U.S. Dist. LEXIS 125789, at *74.

### III.    CONCLUSION

Based on the foregoing, Plaintiffs, who bear the burden of proving that they and the opt-in plaintiffs are similarly situated, have not and cannot demonstrate that they are similarly situated. Plaintiffs have identified a multitude of alleged bases for FLSA violations—the significant majority of which do not apply to all plaintiffs—named or opt-in. And the plaintiffs all have differing job roles, duties, supervisors, and pay. Therefore, the Court must decertify the conditionally certified class and dismiss the opt-in plaintiffs without prejudice. *See e.g., Frye*, 495 Fed. App'x at 672-75 (affirming decertification because the plaintiffs worked different jobs and lacked a common policy or practice applicable to all plaintiffs); *Price*, 2008 U.S. Dist. LEXIS 125789, at *72-75 (granting decertification because the plaintiffs failed to meet their burden because "of the disparate factual circumstances of the different Plaintiffs, the variety of individualized defenses that may be applicable, and the potential for manageability problems"); *Lockhart*, 2020 U.S.

15683-222048 MDC

Dist. LEXIS 145321, at *36-37 (granting decertification when the factors supported decertification).

Respectfully submitted,

RAINEY, KIZER, REVIERE & BELL, P.L.C.

BY:   s/ Robert O. Binkley, Jr.
    ROBERT O. BINKLEY, Jr. BPR #011991
    *Attorney for Hardeman County, Tennessee*
    209 East Main Street
    P. O. Box 1147
    Jackson, Tennessee  38302-1147
    (731) 423-2414
    rbinkley@raineykizer.com


    /s/ Stephen L. Hale
    STEPHEN L. HALE, BPR # 013554
    *Attorney for Defendant John Doolen and the Hardeman County Sheriff's Department*
    Stephen L. Hale, Attorney at Law
    P.O. Box 638
    Bolivar, Tennessee 38008
    (731) 658-5858
    Stevehalelaw@gmailcom


    /s/ Michael T. Schmitt
    MICHAEL T. SCHMITT, BPR # 026573
    *Attorney for Defendant Hardeman County and Jimmy Sain, Individually*
    Ortale, Kelley, Herbert & Crawford
    200 Fourth Avenue North – Third Floor
    Nashville, Tennessee 37219
    (615) 256-9999
    mschmitt@ortalekelley.com

15683-222048 MDC

## CERTIFICATE OF SERVICE

On July 21, 2023, I electronically filed a copy of this pleading. The Court's electronic filing system will provide notice to all parties indicated on the electronic filing report. Parties may access this filing through the Court's electronic filing system.

William C. Sessions, III, BPR# 15017
*Attorney for Plaintiffs*
Sessions Law Firm, PLLC
P.O. Box 331
8756 Chaffee Road
Brunswick, Tennessee 38014
901-848-9654
Wsessions@SessionsLawPllc.com

Stephen L. Hale, BPR # 013554
*Attorney for Defendant John Doolen*
*and the Hardeman County, Tennessee*
*Sheriff's Department*
Stephen L. Hale, Attorney At Law
P.O. Box 638
Bolivar, Tennessee 38008
Phone: 731-658-5858
Fax: 866-528-6360
Stevehalelaw@gmail.com

Frances Hildebrand Sessions, BPR# 16896
*Attorney for Plaintiffs*
Sessions Law Firm, PLLC
P.O. Box 331
8756 Chaffee Road
Brunswick, Tennessee 38014
901-848-9655
Bsessions@SessionsLawPllc.com

Michael T. Schmitt, BPR # 026573
*Attorney for Defendant Hardeman*
*County and Jimmy Sain, Individually*
Ortale, Kelley, Herbert & Crawford
200 Fourth Avenue, North- Third Floor
Nashville, Tennessee 37219
Phone: 615-256-9999
Fax:615-726-1494
mschmitt@ortalekelley.com

s/ Robert O. Binkley, Jr.